Sharon MENSCHIK, et al., Respondents,

v.

MID–AMERICA PIPELINE
COMPANY, Appellant.

No. WD 43069.

Missouri Court of Appeals,
Western District.

June 11, 1991.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 30, 1991.

Application to Transfer Denied
Sept. 10, 1991.

Leonard J. Johnson, Sarah W. Hays, Carolyn R. Wade, Kansas City, for appellant.

John E. Turner, Kansas City, for respondents.

Before SHANGLER, P.J., and KENNEDY and FENNER, JJ.

KENNEDY, Judge.

Mid–America Pipeline Company appeals from a judgment in favor of Sharon Menschik and her husband, Charles Menschik, Gary Smith and Ronald Smith based upon jury verdicts in their respective claims for personal injuries sustained in an L.P. (liquid propane) explosion and fire. The respective verdicts were for $1,092,208 (Sharon Menschik); $78,854 (Charles Menschik); $736,895 (Gary Smith); and $152,666 (Ronald Smith). The damage awards were reduced by amounts which had been received by the plaintiffs from other defendants in settlement, and judgments entered for the respective net amounts. Mid–America

Pipeline has appealed with several allegations of error.

The explosion and fire occurred on September 26, 1985, in a house rented and occupied by Charles and Sharon Menschik near Stewartsville, Missouri. On the day before the accident, Sharon Menschik discovered that the furnace in the basement of the house was not working and called her landlord, Dale Stone, for help. Dale Stone and his son, Allen Stone, went to the house and Allen entered the basement and saw that the pilot light was out. He smelled an odor of gas in the basement. He used a fan to clear the air and then lit the pilot light without incident. Later that same evening, Mrs. Menschik again noticed the house was cool and called Dale Stone for help. Allen Stone went to the Menschiks' house again, smelled gas, but relit the pilot light without incident.

The next morning, Mrs. Menschik left the house and returned that afternoon with her two brothers, Gary and Ronald Smith. Sharon and Gary smelled an unusual odor. Mrs. Menschik determined the furnace was not working and asked her brother Gary if he would relight the pilot light. Mrs. Menschik and Gary went into the basement and smelled a gassy odor. Gary Smith went over to the furnace and read the instructions and turned off the pilot and main valves on the furnace. The directions were to wait five minutes before attempting to relight the furnace. Gary Smith and Sharon Menschik left the basement, leaving the top entryway door open to let the basement air out.

Fifteen to twenty minutes later, Sharon Menschik and Gary Smith returned to the basement. They did not smell gas this time. In attempting to relight the pilot light, an explosion occurred which injured Gary Smith and Sharon Menschik, and Ronald Smith, who was standing near the top of the cellar stairs.

The gas had been transported by Mid–America in its pipelines to its bulk storage tanks in Kearney, Missouri. It was sold by Mid–America Pipeline to Empire Gas Corporation, which in turn sold it to its subsidiary, Empiregas, Inc., of St. Joseph. From

Mid–America Pipeline storage tanks at Kearney the gas was transported to Empiregas storage tanks by truck. At the time of the transfer of the gas from Mid–America Pipeline storage tanks to the truck which would take it to Empiregas storage tanks, Mid–America added an odorizing agent, ethyl mercaptan. Empiregas transported the gas from its storage tanks in St. Joseph to its retail customers, including the Menschiks. The gas was placed in a 500–gallon storage tank outside the Menschik residence.

An odorizing agent is required by law in order to give the L.P. gas, which is odorless, a distinctive smell to warn of its presence. There are various odorants available, including the one used here, ethyl mercaptan.

Ethyl mercaptan is an odorant which can fade. "Odor fade" occurs primarily through two different chemical reactions. One of the chemical reactions is called "oxidation." If ethyl mercaptan molecules come into contact with an oxidizing agent like rust, it changes the molecules so that it has a less pungent odor. The other chemical reaction is called adsorption. Ethyl mercaptan will adsorb to walls and soil or other substances, thus becoming unavailable for detection. Mid–America did not warn Empiregas or the Respondents that this odorant could fade.

Respondents brought a products liability action against Mid–America, claiming Mid–America was strictly liable for Respondents' injuries. The case was submitted to the jury under theories of defective design and failure to warn of the dangers of the defect.

Mid–America says it cannot be held strictly liable for plaintiffs' injuries because it was not a "seller" of the product, but was only a common carrier providing the service of transporting the product. Section 402A of *Restatement (Second) of Torts*, adopted in Missouri by *Keener v. Dayton Elec. Mfg. Co.*, 445 S.W.2d 362, 366 (Mo.1969), applies the rule of strict liability to "one who sells," to a "seller [who is] engaged in the business of selling" the product.

A "seller" of a product is not, however, so narrowly defined. While Mid–America did not buy, produce, sell or have title to the gas itself, it did select the odorant to be added and it added the same for a charge which was added to the cost of transporting and storing the gas itself. In adding the odorant to the gas, Mid–America went aside from its common carrier function. In adding the odorant it enhanced, or modified, the product. This brings Mid–America within the case of *Gunderson v. Sani-Kem Corp.*, 674 S.W.2d 665 (Mo.App.1984), where we said:

> The word "sells" within the Restatement rule, [*Rest. (Second) of Torts*, § 402A] of strict liability is merely descriptive, and the test for determining the applicability of the rule is not the sale of the product, but rather the placing thereof in commerce. Thus, liability is imposed on all those in the chain of placing a defective product in the stream of commerce, and the product need not be actually sold if it is injected in the stream of commerce by other means. Under the stream-of-commerce approach to strict liability no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the Courts will impose strict liability; it is the defendant's *participatory connection, for his personal profit or other benefit,* with the injury-producing product and *with the enterprise that created consumer demand for and reliance upon the product* which calls for the imposition of strict liability....

*Id.* at 668 (quoting 72 C.J.S. *Products Liability* § 40 (Supp.)).

Mid–America only transported and stored the unodorized gas, but it placed the gas-with-odorant—the product which would in due course be placed in use by the consumer—in the stream of commerce. Mid–America's participatory connection with the injury-producing product, for its personal profit, makes it responsible under modern products liability theory for the injury

caused to the unwary consumer who is injured by the product. *Id.*

▉ Mid–America next points out it was a bulk seller with no contact with the end user and no means of warning him of the dangers of the fading odorant. This fact, it says, relieved it of any duty to warn the plaintiffs of the danger of the fading odorant—that it could depend upon its buyer, Empiregas, who was knowledgeable of the characteristics and dangers of L.P. gas, and who would have direct contact with the consumer, to give to the consumer any necessary warning.

The argument that Mid–America makes was made by defendant in *Donahue v. Phillips Petroleum Co.*, 866 F.2d 1008 (8th Cir.1989). The court, applying Missouri law, rejected defendant's claim in the following language:

> Phillips proposes that the "sophisticated user" doctrine be invoked in tandem with the "bulk supplier" doctrine to excuse it from strict liability because it claims that its immediate purchaser should have known of the dangers of the product. We are persuaded that Missouri law does not authorize such an approach, which effectively would undercut the strict liability analysis set forth in *Racer.* [Referring to *Racer v. Utterman,* 629 S.W.2d 387 (Mo.App.1981)].

*Id.* at 1012–1013.

In footnote 9 of the *Donahue v. Phillips Petroleum Co.* case, the Eighth Circuit, in speaking of the so-called "learned intermediary" rule, noted:

> Missouri courts have developed another exception, known as the "learned intermediary" doctrine, for the special case involving a drug manufacturer that supplies prescription drugs to a doctor, who then prescribes them to a patient.... The rationale for that exception, that a patient may obtain the product only through a qualified professional who presumably will explain the dangers of the product to the patient, cannot sensibly be stretched to apply to this case. Whatever else Williams Pipeline may be, it is not

> a "learned intermediary" within the meaning of the Missouri doctrine.

*Id.* at 1013.

Mid–America cites *Morris v. Shell Oil Co.*, 467 S.W.2d 39 (Mo.1971), for the proposition that the bulk supplier in Mid–America's position may not be held liable for failure to warn the consumer of a product's danger, when it has no contact with the consumer and no feasible way of warning the end user. *Morris* was a negligence case, submitted under the predecessor of present MAI 25.06, and the question under consideration by the court was whether the bulk supplier was negligent in failing to warn. The court held that the plaintiff had failed to make a case against the bulk supplier when she failed to prove that the bulk supplier had not warned the retail dealer with the intention that the retail dealer warn the consumer. Strict liability under Restatement (Second) § 402A, submitted under MAI 25.05, does not require proof that a seller was negligent in failing to warn. *Donahue,* 866 F.2d at 1013; *Racer v. Utterman,* 629 S.W.2d 387, 392–95 (Mo.App.1981).

Mid–America seeks to bring itself within the rule of *Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143, 146 (Mo.1967), and *Johnston v. Upjohn Co.*, 442 S.W.2d 93, 95 (Mo.App.1969), which excuses a pharmaceutical distributor from warning a user of the dangers of a prescription drug, when the drug is to be prescribed by a physician, who presumably will give his patient any warning which may be required. Empire Gas Company is not, however, such a "learned intermediary" as a physician would be. The extension of the "learned intermediary" defense to such a seller as Mid–America was rejected in *Donahue,* 866 F.2d at 1013.

▉ Mid–America says that it was entitled to a directed verdict or to judgment n.o.v. because plaintiffs failed to prove a causal link between the absence of warning and the explosion and fire which caused plaintiffs' injuries. It is the plaintiff's burden to prove causation. *Hill v. Air Shields, Inc.*, 721 S.W.2d 112, 119 (Mo.App. 1986). However, direct proof thereof is not

required; the jury may infer causation from circumstances. In the absence of "compelling evidence" establishing the absence of causation, the causation question is for the jury. *Racer v. Utterman*, 629 S.W.2d at 394.

■ Mid–America then says plaintiffs failed to make a submissible case, and it was therefore entitled to a directed verdict or to judgment n.o.v., because there was no proof the L.P. gas was defective when it left Mid–America's control. The case was submitted, however, both on product defect (MAI 25.04) and failure to warn (25.05) hypotheses, and plaintiffs' failure to make a submissible case of product defect would not entitle Mid–America to a directed verdict if plaintiffs' evidence made a prima facie failure to warn case—which, as we have held above, it did. If plaintiffs failed to make a defective product case, the erroneous submission of that theory would only entitle Mid–America to a new trial, not to a directed verdict.

■ Mid–America claims the court erred in allowing expert witnesses Stubbs, Dunn and Bullerdiek, to testify to their respective opinions that: ethyl mercaptan was subject to the phenomenon of "odor fade"; that because of ethyl mercaptan's susceptibility to "odor fade" the gas odorized therewith was a defective and unreasonably dangerous product; that ethyl mercaptan was defective and unreasonably dangerous in the absence of additional warnings; and that odor fade had actually occurred at the time the fire and explosion occurred.

Mid–America does not challenge the qualifications of any of plaintiffs' experts. It challenges instead the factual basis of the experts' testimony. This objection is untenable. The facts upon which the experts' opinions were based were in evidence. There was evidence that the gas was odorized with ethyl mercaptan. There was evidence that ethyl mercaptan was susceptible to odor fade. These facts were not disputed. Then, based upon plaintiffs' testimony that there was a gassy odor in the basement when they first went into the basement to turn off the furnace, which

odor had disappeared fifteen or twenty minutes later when they went into the basement the second time, witness Dunn, who was a chemical engineer, assuming the disappearance of the gassy odor in the space of 15 or 20 minutes between Sharon's and Gary's first and second trips to the basement, and taking into account the nature of ethyl mercaptan and the conditions existing in the basement, gave as his expert opinion that odor fade had actually occurred and that it accounted for the disappearance of the gassy odor at the time of Gary's attempt to light the furnace. The evidentiary basis for Dunn's opinion was sufficient. An expert's opinion may be based upon facts of his own knowledge, or upon facts which he assumes. If based in whole or in part upon facts which he assumes to be true, there must be independent evidence of the truth of those facts. *Repple v. Barnes Hosp.*, 778 S.W.2d 819, 822 (Mo.App.1989). The evidentiary basis for Dunn's opinion was sufficient, and the court did not err in overruling Mid–America's objection thereto.

If there were other facts which Mid–America believed the experts, or any of them, did not take into account in their opinion testimony, such facts could be posed to the witness upon cross-examination. Opinion testimony is not to be rejected upon an objection that it fails to take certain facts into account. *See Salsberry v. Archibald Plumbing & Heating Co.*, 587 S.W.2d 907, 913 (Mo.App.1979).

■ Plaintiffs over Mid–America's objections presented evidence that other odorants than ethyl mercaptan were available, which were not subject to odor fade, but that Mid–America had chosen ethyl mercaptan because of its lesser cost. Mid–America points out that this evidence tends to show its negligence and that the seller's negligence has no place in strict liability products liability case. The evidence was clearly admissible, however, in that it bore upon the design of the end product, to wit, the gas-with-odorant, which bore in turn upon the ultimate issue whether the product, given its danger, was unreasonably

dangerous. *Duke v. Gulf & Western Mfg. Co.*, 660 S.W.2d 404, 412 (Mo.App.1983).

■ Mid–America complains of the admission of two printed safety pamphlets, prepared and distributed by retail L.P. gas sellers to L.P. gas users. The pamphlets say on their covers: "To Our LP–Gas Customer: Take a few minutes to read this, for the day when there may be only seconds to spare." The pamphlets warn the reader of L.P. gas dangers, including the danger of odor fade. Testimony of expert witnesses was to the effect that these pamphlets were representative of the kind of warnings which ought to be given to consumers. We have noted Mid–America's criticisms of these pamphlets but we conclude the pamphlets were properly admitted by the trial court.

■ Finally, Mid–America criticizes the modifications of the MAI verdict-directing instructions. The cases of the respective plaintiffs were submitted on the instructions correctly patterned after MAI 25.04 (defective unreasonably dangerous product) and 25.05 (failure to warn).

The first modification complained of was that the instruction as given required the jury to find that Mid–America "odorized gas for a charge in the course of defendant's business," instead of, as unmodified MAI 24.04 and 25.05 has it, that defendant "sold" the gas. There is really no issue in the case about what Mid–America did, or about its participatory connection for profit with the end product, the gas-with-odorant. We have held, infra, that Mid–America's contribution to the end product was the equivalent of a "sale" within the meaning of Restatement § 402A. The modified language is supported by the evidence. There could be no possible prejudice to Mid–America in this deviation from the instruction printed in MAI.

The second modification, drawn from MAI 19.01, was that the instruction as given allowed the jury to find for plaintiff if the defective condition "either directly caused or [and it is the following part which deviates from the pattern instruction, and to which Mid–America objects] combined with the condition of the furnace and/or the acts of the Empire Gas Companies to directly cause damage to plaintiff." Defendant says the objected to language should have been omitted, since Mid–America was the sole defendant—that the language somehow lessens plaintiffs' burden of proof. The evidence supports the submission; Mid–America does not say otherwise. We can see no prejudice to defendant in this submission. It has been approved in other single defendant cases. *Eagleburger v. Emerson Elec. Co.*, 794 S.W.2d 210, 222–25 (Mo.App.1990) (en banc); *See Jines v. Young*, 732 S.W.2d 938, 949 (Mo.App.1987); *Earll v. Consolidated Aluminum Corp.*, 714 S.W.2d 932, 937 (Mo.App.1986).

The judgment is affirmed.

All concur.