[No. F056892. Fifth Dist. Oct. 7, 2010.]

MICHAEL SEAN HUITT et al., Plaintiffs and Respondents, v.
SOUTHERN CALIFORNIA GAS COMPANY, Defendant and Appellant.

COUNSEL

Horvitz & Levy, David M. Axelrad, John A. Taylor, Jr., Daniel J. Gonzalez; Jamiel G. Dave; Peel, Garcia & Stamper and James W. Peel for Defendant and Appellant.

Fitzgerald, Lundberg & Romig, Ken M. Fitzgerald, Barbrae Lundberg; Dowling, Aaron & Keeler, Lynne Thaxter Brown and Richard M. Aaron for Plaintiffs and Respondents.

OPINION

**CORNELL, J.**—Michael Sean Huitt and Matt Nino (hereafter collectively plaintiffs) were injured while attempting to light a water heater at a construction site (hereafter the school site or school) owned by the Porterville Unified School District (hereafter the school district). After initial attempts to light the water heater's pilot light failed, Huitt decided to bleed any accumulated air in the natural gas pipe. This action caused natural gas to accumulate in the water heater closet. After Huitt sealed the natural gas line, he again attempted to light the water heater's pilot light. The accumulated natural gas exploded, resulting in serious injuries to plaintiffs.

Plaintiffs filed suit against the Southern California Gas Company (hereafter the Gas Company), alleging that the natural gas that had accumulated in the water heater closet lacked any odorant. Natural gas, in its natural state, is a colorless and odorless gas. Federal regulations require odorant be added to natural gas so that it is detectable by a person with a normal sense of smell. (49 C.F.R. § 192.625(a) (2010).)

The evidence established that the odorant added to natural gas is adsorbed by new steel gas pipes until the pipes become seasoned (or saturated). It was undisputed that the natural gas supplied by the Gas Company to the school site was odorized properly at the meter, but the odorant was adsorbed as it traveled through the new steel gas pipes owned and installed by the school district.

Plaintiffs argued the Gas Company had a duty to warn them that new steel gas pipes adsorb the odorant in the natural gas and, had they known of this fact, they would not have bled the gas pipe into a confined closet. The jury agreed and awarded each plaintiff in excess of $1 million in compensatory damages. In addition, the jury found that the Gas Company acted with malice and awarded each plaintiff $5 million in punitive damages.

The Gas Company urges us to reverse the judgment for a variety of reasons. It contends it did not owe a duty to plaintiffs and, even if it did, plaintiffs failed to establish a causal connection between the failure to warn and plaintiffs' injuries. It also alleges that the trial court was without jurisdiction to hear the case because it was preempted by the authority of the Public Utilities Commission. Finally, the Gas Company argues there was no evidence to establish it acted with malice.

■ We find it unnecessary to address each of these arguments because we conclude there was no evidence that, had the Gas Company issued a warning, either Huitt or Nino would have been aware of it. The lack of evidence that the Gas Company's failure to issue a warning was the cause of the accident precludes recovery by plaintiffs. Accordingly, we will reverse the judgment and order judgment be entered in favor of the Gas Company.

## FACTUAL AND PROCEDURAL SUMMARY

### I. *Pleadings*

In the first amended complaint, plaintiffs alleged they were hired to perform various tasks at the school site, including the lighting of a hot water heater. Natural gas escaped from natural gas pipes and, when plaintiffs attempted to light the water heater, fire filled the room, causing them serious and permanent injuries.

Plaintiffs specifically alleged the Gas Company negligently installed, maintained, and inspected its equipment, resulting in a gas leak that resulted in the fire that injured plaintiffs.[1] In a separate cause of action, plaintiffs alleged the Gas Company's product was unsafe because the odorizing agent added to the natural gas was neutralized when it ran through the new pipes at the school site. Therefore, when gas escaped from the pipes, plaintiffs were unable to smell it and attempted to light the water heater, even though the room was filled with natural gas. The Gas Company responded with a general denial to the unverified complaint and asserted 19 affirmative defenses.

### II. *Testimony*

This was a lengthy trial with numerous witnesses. Although we have reviewed the entire transcript of the trial, we limit our factual summary to the witnesses we deem relevant to the issue of causation.

---

[1] The first amended complaint also contained causes of action against the architect and engineering firm for the project, as well as the manufacturer of the tank. As these defendants are not parties to the appeal, we will focus only on the action as it relates to the Gas Company.

*Michael Sean Huitt*

Huitt, an experienced plumber, was employed by Todd's Plumbing and was told to go to the school site to work on a list of items that needed completion. When he arrived there on November 16, 2005, he was told there was no hot water on one side of the building. Huitt went into the water heater closet and followed his standard procedure for starting a water heater. He turned on the gas valve, turned the valve to "pilot," held down the red button, and hit the striker to light the pilot light. The pilot light did not light. Huitt glanced at the lighting instructions but did not pay attention as he had lit many water heaters in the past.

When the water heater would not light, Huitt shut off the natural gas valve and then opened a valve to bleed out any air that might have been in the gas pipe. A high pressure stream of what later was determined to be natural gas came out of the gas pipe. This caused Huitt to believe the gas pipe was still under air test pressure. In a normal natural gas pipe there should be only about one-half pound per square inch of pressure. There was considerably more pressure in this pipe, causing Huitt to believe air test pressure had been retained in the pipe. The only odor Huitt smelled was of pipe machine oil. He did not smell natural gas. Had he smelled natural gas, he would have opened the door and aired out the room before again attempting to light the water heater.

Huitt left the gas pipe open for a "matter of seconds." He then put the cap back on and followed the same procedures to light the pilot light. When he hit the igniter, he heard the "whoosh of the flame." Huitt held his breath, closed his eyes, and pushed Nino into the small room next to the water heater closet. The door shut behind Nino and Huitt fell to the ground. He could smell his hair and skin burning and knew he would be severely scarred. He tried to open the door, but the skin on his hand peeled off. Nino eventually opened the door and helped Huitt out of the closet.

Huitt was in severe pain and was taken to the local hospital where he was treated. He was transferred to the burn center at University Medical Center (UMC) for further treatment. Huitt was diagnosed with superficial first and second degree burns on his left and right upper extremities, including his hands, totaling 6 percent of his body. The pain was severe and Huitt lost consciousness several times during treatment.

Huitt insisted on going home the following day. His wife assisted in his care. His bandages had to be changed twice a day, and each time the pain was excruciating. Huitt also suffered three outbreaks of MRSA (methicillin-resistant Staphylococcus aureus), a severe infection. Two of Huitt's sons also

contracted MRSA infections. He returned to work a few weeks after the accident. Thankfully, he did not have any residual scarring.

At the time of the accident, Huitt did not know odorant in natural gas could fade.

*Matt Nino*

Nino was working as a plumber's helper on the day of the accident. He had gone with Huitt to the school site to work on a punch list. The superintendent on the school site showed them to the water heater closet, which was inside of a janitor's closet. Huitt and Nino tried to start the water heater but it would not light. They decided to bleed the gas pipe for five to 10 seconds. Huitt then attempted to light the water heater and the natural gas in the room ignited. Nino reached for the door but the skin came off of his hands. He eventually was able to open the door and exit the room. The door closed before Huitt was able to get out of the room. Nino opened the door with his elbow and Huitt was able to escape. They went outside and were sprayed with water by one of the other workers. When the ambulance arrived, they were given morphine and taken to the local hospital. From there they were transported to the burn unit at UMC, where they were admitted to the intensive care unit.

Nino went through the debridement process, which caused incredible pain. Initially, the bandages had to be changed daily, but then Nino was given a different bandage that had to be changed every other day. It was extremely painful when the bandages were removed. Nino had to make sure the bandages did not dry out, so every four hours he had to squirt distilled water on them.

After discharge, Nino returned to the hospital every other day to have his bandages changed. After approximately two weeks, he began using a bandage that had to be changed daily, but could be changed at home. He was required to keep his injuries bandaged for three to four weeks.

Nino eventually contracted an MRSA infection in his leg that caused him to miss a few days of work. He has not had an outbreak since early 2006. He did not need skin grafts after the accident.

Nino admitted that neither he nor Huitt read the instructions when attempting to light the water heater.

*Ronald Aaron Marks*

Marks, a mechanical engineer who was retained by plaintiffs, examined the water heater Huitt was attempting to light. No flaws were found in the water

heater. He opined that when Huitt pushed the igniter button, the spark ignited the natural gas Huitt had bled into the room. Marks went on to opine that there was no odorant in the natural gas because, if there had been, Huitt, an experienced plumber, would have smelled the odorant and would not have attempted to light the water heater.

Marks did not fault Huitt for not reading the installation manual for the water heater because Huitt had worked with the same unit before and was familiar with it.

Marks reviewed the manual for the water heater and noted it advised the installer that "conditions such as odor fade can cause the odorant to diminish intensity or fade and not be readily detectable." Prior to this case, Marks had not heard of odor fade. Nor had he seen a warning in the installation manuals of various plumbing appliances with which he was familiar.

After learning of odor fade, Marks spoke with numerous individuals in the field. None of the individuals with whom Marks spoke had heard of odor fade. He researched the issue on the Internet, however, and discovered "a lot of information" about odor fade.

Marks, who had reviewed warnings from gas companies, had never seen a warning involving odor fade. On cross-examination, he was presented with several instruction manuals for various appliances that all had warnings about odor fade.

Marks opined that Huitt did not violate the plumbing code requirement that prohibits the purging of natural gas into confined spaces because neither Huitt nor Nino smelled any natural gas.[2]

*Paul Bladdick*

Bladdick, a plumber called as an expert witness by plaintiffs, has written a few articles about odor fade in publications directed at the plumbing trade.[3] Bladdick did not know of any gas company in the United States that warned about odor fade. He searched the Internet and found numerous articles on the topic.

---

[2] This provision in the plumbing code applies only if there are sources of ignition present. If so, purging is allowed only if the space is ventilated, the purge rate is controlled, and all hazardous conditions are eliminated.

[3] Although it appears that Bladdick was aware of odor fade before this accident, it is unclear whether the articles were published before or after this accident.

■■■■■■■■

*Edward Saltzberg*

Saltzberg, a mechanical engineer specializing in plumbing engineering, has been working in the plumbing field for over 60 years and has published over 40 articles in various plumbing related publications. He had never heard of odor fade before this case. When he learned of the topic, he discussed it with the Los Angeles chapter of the American Society of Plumbing Engineers (ASPE) and the Los Angeles chapter of the International Association of Plumbing and Mechanical Officials (IAPMO). No one at either meeting had heard of odor fade, including a representative of the Gas Company. Nor had any of the Gas Company's representatives who attended the meetings ever mentioned odor fade as a potential problem in new construction (or any other context).

Saltzberg opined that the accident would not have occurred if Huitt had smelled the odorant in the natural gas because he would not have attempted to light the water heater with gas in the room. Saltzberg further opined that Huitt complied with the requirements of the plumbing code when he attempted to light the water heater. It is normal practice to continue bleeding a gas pipe until you smell gas, so Saltzberg did not fault Huitt for bleeding the gas pipe when the water heater initially did not light.

*Thomas Liston*

Liston, a mechanical engineer who specializes in heating, ventilation, air conditioning, and plumbing, was retained by the school district's insurer to investigate the cause of the fire.

Liston did not find any problem with the two pressure reducers in the gas pipe. He calculated that Huitt must have purged the pipe for about two minutes to build up a sufficient quantity of gas in the water heater closet to ignite. It would have been impossible for enough natural gas to accumulate in the water heater closet to cause the explosion if the pipe had been purged for approximately five seconds.

Liston found "a lot of literature on odorant and odorant fade" on the Internet. He opined that the cause of this accident was a lack of odorant in the natural gas. He also opined that gas companies should provide information about new steel pipes adsorbing the odorant in natural gas.

*Patrick McShane*

McShane was employed as a measurement and regulation technician for the Gas Company at the time of the accident. One of his duties was to check

the level of odorant in the natural gas. The tests were conducted monthly. On October 7, 2005 (five weeks before the accident), McShane checked the odorant of the natural gas in the Springville gas pipe and recorded that it was "readily detectable to strong."[4] McShane expected the odorant to be at approximately the same level at the school site meter. In November 2005, the test results indicated the odor was readily detectable. The same result was reached when the Springville pipe was checked in December 2005 and January 2006.

### Mark Wurtenberger

Wurtenberger had worked for the Gas Company for 34 years turning on gas. Wurtenberger turned on the gas at the school site on September 9, 2005. The water heater in question had not been installed, but the kitchen was functional. There was a leak at that time and he issued a written notice of a dangerous condition.

### Ivan Zelada

Zelada was a senior engineer with the Gas Company. As part of his job, he was responsible for pickling new natural gas pipes. He explained that pickling pipes occurs when additional odorant is injected into natural gas transmission pipes so that the natural gas does not lose its odorant when it passes through new transmission pipes.

Zelada thought that a possible cause of the loss of odorant at the school site was adsorption of the odorant by the new gas pipes installed by the school district. This was the first time Zelada had seen a situation where the customer's pipes had adsorbed the odorant in the natural gas.

### Larry Sasadeusz

Sasadeusz managed the engineering analysis center for the Gas Company. The engineering analysis center is similar to a research facility, and one of its tasks is to ensure that the Gas Company's natural gas is odorized properly. He explained the Gas Company's policy was to contact the engineering analysis center when a project included around 1,000 feet of new six-inch diameter steel pipe. Various factors would be examined then to determine if, and how, a new pipe would be pickled.

Sasadeusz explained that United States Department of Transportation regulations require natural gas to be odorized at one-fifth the lower explosive

---

[4] The Gas Company rated the odor of natural gas on a scale of one to five (1-not detectable; 2-barely detectable; 3-readily detectable; 4-strong; 5-very strong).

limit. He explained that natural gas will not ignite in the air if it is diluted below 5 percent. Nor will it ignite if the concentration is above 15 percent. It will ignite only if the concentration of natural gas is between 5 and 15 percent. Therefore, the regulations require that sufficient odorant be added to natural gas so that it is readily detectable whenever the concentration level reaches one-fifth of 5 percent, or 1 percent (one part natural gas to 100 parts air).

### Bernard Cuzzillo, Ph.D.

Cuzzillo, a consulting mechanical engineer called as an expert witness by the Gas Company, opined that Huitt must have bled the natural gas pipe for a minimum of two and one-quarter minutes for enough gas to accumulate and explode when Huitt attempted to light the water heater. He explained that if the pipe had been bled for a shorter time, the concentration of gas in the room would have been insufficient to support combustion. He also explained that the pipe could not have been under test pressure because it was in use for appliances other than the water heater and excessive pressure would have damaged not only the water heater but also these other appliances.

### III. The Judgment

The jury found that the Gas Company should have warned about odor fade, and the failure to do so was a substantial factor in plaintiffs' injuries. Huitt was awarded lost earnings of $6,720, medical expenses of $14,938.73, no future economic damages, past noneconomic damages of $720,000, and future noneconomic damages of $625,000. Nino was awarded lost earnings of $7,662.52, medical expenses of $28,266.09, no future economic damages, past noneconomic damages of $820,000, and future noneconomic damages of $525,000.

Huitt was found to be 12 percent at fault, while Nino's actions were found not to have contributed to the accident.

The jury also found that the Gas Company acted with malice and that such action was authorized or approved by its officers and awarded Huitt and Nino $5 million each in punitive damages.

### DISCUSSION[5]

Plaintiffs were required to prove the Gas Company's failure to warn about odor fade was a substantial factor in causing their injuries. (*Johnson v.*

---

[5] We realize that we must presume that the Gas Company had a duty to warn in order to reach the issue of causation. This presumption is for the purpose of discussion only, and we express no opinion on the issue.

*American Standard, Inc.* (2008) 43 Cal.4th 56, 64 [74 Cal.Rptr.3d 108, 179 P.3d 905] (*Johnson*).) The trial court instructed the jury that plaintiffs were required to prove "that lack of sufficient warnings was a substantial factor in causing" their injuries.

The Gas Company contends there was no evidence that its conduct was a cause of the accident. Plaintiffs argue, however, that had they known natural gas odorant could be adsorbed by new steel pipes, they would not have bled the natural gas pipe for over two minutes into a confined area, thus avoiding the accident.

### Definition of Causation

██ Causation consists of two separate questions: (1) was the Gas Company's conduct the cause in fact of plaintiffs' injuries, and (2) are there policy factors that may preclude the imposition of liability. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1235, fn. 1 [135 Cal.Rptr.2d 629, 70 P.3d 1046].) " 'An act is a cause in fact if it is a necessary antecedent of an event.' [Citation.] 'Whether defendant's negligence was a cause in fact of plaintiff's damage : . . is a factual question for the jury to resolve.' [Citation.] [¶] By contrast, the second element focuses on public policy considerations. Because the purported causes of an event may be traced back to the dawn of humanity, the law has imposed additional 'limitations on liability other than simple causality.' [Citation.] 'These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy.' [Citation.] Thus, 'proximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." ' [Citation.]" (*Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1045 [135 Cal.Rptr.2d 46, 69 P.3d 965].) While this case implicates both aspects of causation, we conclude that plaintiffs have not established that the Gas Company's failure to warn was a cause in fact of their injuries.

### Analysis of Evidence

We must determine whether the Gas Company's failure to issue a warning about the propensity of new steel pipes to adsorb the odorant in natural gas was a substantial factor in causing plaintiffs' harm. We review the record for substantial evidence. (*Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115, 1137 [122 Cal.Rptr.2d 139], overruled on other grounds in *People v. Ault* (2004) 33 Cal.4th 1250, 1272, fn. 15 [17 Cal.Rptr.3d 302, 95 P.3d 523].) We are required to review the whole record, looking for evidence that is reasonable, credible, and of solid value. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Superior Court (Jones)*

(1998) 18 Cal.4th 667, 681 [76 Cal.Rptr.2d 641, 958 P.2d 393].) We presume the existence of every fact the trier of fact reasonably could deduce from the evidence that supports the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) We will not substitute our evaluations of a witness's credibility for that of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

Plaintiffs' counsel argued to the jury that the accident was caused by the lack of odorant in the natural gas. Plaintiffs urge us to find substantial evidence of causation because two of their experts testified that once they learned of odor fade, they began doing whatever they could to spread the word throughout the industry. One of their experts brought the issue up at local meetings of the IAPMO and the ASPE. Another expert testified he had made it a "personal campaign" to get the word out. Finally, plaintiffs argue that causation is a matter of common sense and the jury could have inferred from the facts that a warning would have prevented Huitt's actions leading to the accident.

Plaintiffs' arguments confuse *knowledge* with *causation*. Their argument, in essence, is that if they had *known* that the odorant in natural gas could fade, they would not have bled the natural gas pipe servicing the water heater for over two minutes.[6] We agree with this contention. But causation, in this case, requires plaintiffs to prove that if the Gas Company had issued a warning, they would have acquired the knowledge they lacked. A warning that never reached plaintiffs would not have changed the events that occurred on the day of the accident.

Plaintiffs fail to address this issue, perhaps because of the difficulties of providing an effective warning in this case. In many instances, a manufacturer issuing a warning has a simple and expedient method to do so. A manufacturer of cigarettes can print a warning on the package containing the product. Similarly, a manufacturer of a table saw can include warnings with its product, even placing warning labels directly on the product.

Not so here. The product, natural gas, is conveyed over great distances directly to the consumer through pipelines, most of which are never seen by

---

[6] We recognize that plaintiffs testified they bled the line for only a few seconds. The expert testimony, however, conclusively established that it would have been impossible for enough natural gas to accumulate in the water heater closet to cause an explosion if the line was bled for only a few seconds. Expert testimony also conclusively established that it would have been impossible for the line to be under "test pressure" because it was connected to the rest of the system, and other aspects of the system were operating normally. This is not to suggest that plaintiffs were untruthful at trial. They were involved in a traumatic accident resulting in serious injuries. We simply conclude they were mistaken when they testified about the length of time the line was bled.

the consumer. In most instances, the consumer never handles the product, but uses the product in other appliances for the consumer's benefit. The consumer has no direct contact with the product itself. Even if the consumer has direct contact, the product cannot be seen.

Therefore, if a warning is required it must be delivered in some other form. So, how can the Gas Company effectively warn consumers and tradesmen about odor fade? This is a question plaintiffs did not answer in the trial court, and have not answered in this court. Several possible vehicles for issuing a warning have been posited but, as we shall explain, none withstand analysis.

At one point plaintiffs argued to the jury that a notice could be included in customers' bills, or a warning could be posted on the Gas Company's Internet Web site. Plaintiffs also seemed to suggest the Gas Company could have its employees, who attend meetings of various plumbing organizations, inform those organizations about odor fade.

Every one of these examples requires some proof that the warning would have reached plaintiffs. If a warning had been included in each of the bills sent to customers by the Gas Company, plaintiffs would not have received the warning unless they purchased natural gas from the Gas Company. If they were the Gas Company's customers, they would not have received the warning unless they opened the family mail *and* saw the warning by reading the material enclosed. There was no testimony that plaintiffs bought natural gas from the Gas Company, opened their bills, or reviewed each enclosure in detail.

Moreover, issuing a warning in this fashion would be ineffective. Although the record is silent on the issue, we are confident that the vast majority of the Gas Company's customers receive their natural gas in established natural gas pipes. From this record it appears that odor fade occurs in *new* steel gas pipes. Few, if any, established customers would be concerned with issues related to new steel pipes. An effective warning must be directed at new construction and the customers of new construction.

The lack of causation also is apparent if other forms of warnings, even those directed to the new construction industry, are examined. A warning to design professionals may result in the warning being added to the plans prepared for the project, but it is uncertain that such a warning would reach a plumber working on a project, especially in a case like this where plaintiffs were sent to the job site to perform minor tasks after the pipes were installed.

Perhaps warnings could be given to building inspectors. Again, however, there is no guarantee that a plumber working on a large project would have

contact with the building inspector, or the topic would be addressed if the plumber happened to meet with the building inspector. Even if the Gas Company's employees informed the job foreman at every large job site of the possible loss of odorant in the natural gas, we cannot be certain that the job foreman would pass the word on to every individual plumber. We are certain that this record contains no evidence that would permit us to infer such a warning would have reached plaintiffs in this case.

One of plaintiffs' experts stated he brought up the issue at a local IAPMO meeting, and the minutes of the meeting were included in a national publication. We need not evaluate the thoroughness of the information included in the publication to recognize the deficiency in this type of approach. The publication was limited to members of IAPMO. There is no indication that plaintiffs were members of IAPMO. Even if they had been members, there was no evidence that they read the IAPMO publication and the minutes of the meetings of the local chapters included therein. For that matter, there was no evidence plaintiffs thoroughly read any trade publication. Therefore, even if the Gas Company had placed a full-page advertisement warning of odor fade in the largest publication directed at the plumbing industry, the warning may not have reached plaintiffs.

Nor will directing a warning to each licensed plumber in the state withstand analysis. There was no evidence in the record that plaintiffs were licensed plumbers, so they would not have received the warning. Plaintiffs did work for a plumbing contractor, who presumably was licensed. There is no certainty, however, that a warning received by plaintiffs' employer would have been relayed to plaintiffs themselves. If the warning had been received one or two years before the project, it may well have been forgotten by the time plaintiffs were directed to the job site, or deemed irrelevant by plaintiffs' employer for the tasks plaintiffs were to perform at the school site.

Nor was there any evidence that plaintiffs ever visited the Gas Company's Internet Web site. Therefore, even if an adequate warning was contained there, there was no evidence it would have reached plaintiffs.

The difficulty of designing a warning that would have reached plaintiffs also is clear from the testimony in this case. It was undisputed that the water heater plaintiffs were attempting to light had a label on it advising plaintiffs to read the installation manual. It also was undisputed that the installation manual warned of the possibility of odor fade, although it apparently did not specifically state new steel pipes could cause odor fade. Therefore, plaintiffs would have known odor fade could occur if they had read the installation

manual.[7] Their failure to read the installation manual demonstrates the difficulty in getting a warning to these plaintiffs.

The water heater also had lighting instructions affixed to it that informed plaintiffs to wait five minutes between attempts to relight the pilot light. Each of plaintiffs' experts testified that plaintiffs acted reasonably in ignoring this warning on the water heater. They also testified that there was no need to read the installation manual because plaintiffs simply were lighting the pilot light, not installing the water heater. Moreover, plaintiffs themselves testified they had installed similar water heaters in the past.

If it is acceptable for plumbers to ignore the warnings and installation manuals, what certainty is there that they will read or heed a warning about odor fade placed on the water heater or mailed to them. Plaintiffs' experts, and plaintiffs themselves, relied on experience to justify plaintiffs' actions in this case, even though they had before them a warning about odor fade (in the installation manual). But, as this case demonstrates, experience is not always sufficient to avoid injury.

This lengthy discussion points out the absence of any evidence to suggest plaintiffs would have received any warning issued by the Gas Company, even if the warning were comprehensive and issued in many different ways. Plaintiffs' suggestions otherwise are insufficient. We reject their request that we rely on common sense. Common sense tells us only that if plaintiffs knew about odor fade, and had thought about it before bleeding the natural gas pipe into a confined water heater closet, then they might have chosen a different course of conduct. Common sense cannot tell us that there was some form of warning that would have reached plaintiffs *on this record.* We look for substantial evidence, not speculation.

### *Review and Applicability of Relevant Cases*

The cases we have reviewed confirm our conclusion that plaintiffs did not present sufficient evidence to establish causation. The plaintiff in *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763 [107 Cal.Rptr.2d 617, 23 P.3d 1143] (*Saelzler*) was employed by Federal Express when she attempted to deliver a package to a large apartment complex owned by the defendants. She was attacked and seriously injured by three individuals who were never

---

[7] Plaintiffs' counsel attacked the warning in the manual as hidden and inadequate because it did not mention new steel pipes as the cause of odor fade. We fail to see the significance of the reason the odorant was adsorbed in this case. What was significant was that the odorant had faded. If plaintiffs had read the warning, it may have been effective to prevent their actions in this case. Plaintiffs, however, did not read the manual, even though they had installed this type of water heater on numerous occasions in the past.

identified. Saelzler sued the defendants, alleging they failed to provide adequate security, despite their knowledge that dangerous persons frequented the premises. The issue before the Supreme Court was whether Saelzler could establish that the defendants' negligence was the cause in fact of her injuries, i.e., was "defendants' possible breach of duty a substantial factor in causing plaintiff's injuries?" (*Id.* at p. 772.)

The Supreme Court began its analysis by noting that " '[a] mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, *it becomes the duty of the court to direct a verdict for the defendant.*' [Citation.]" (*Saelzler, supra,* 25 Cal.4th at pp. 775–776.) The plaintiff's inability to identify her assailants made proving causation difficult. They could have been tenants of the complex and authorized to be on the premises. (*Id.* at p. 776.) Accordingly, "she cannot show that defendants' failure to provide increased daytime security at each entrance gate or functioning locked gates was a substantial factor in causing her injuries. [Citations.]" (*Ibid.*) Moreover, the Supreme Court rejected her assertion that increased security presence at the complex would have prevented her injuries because "the argument is entirely speculative, as assaults and other crimes can occur despite the maintenance of the highest level of security. [Citations.]" (*Id.* at p. 777.)

The Court of Appeal found that Saelzler had presented sufficient evidence of causation using a practical approach. The Supreme Court disagreed. "[T]he majority held that common sense and common experience should lead us to conclude that a defendant's 'complete absence of required security measures' is necessarily a 'contributing cause of most crimes occurring on that property.' " (*Saelzler, supra,* 25 Cal.4th at p. 778.) "[W]e hesitate to adopt a rule of common sense that seemingly would prevent summary judgment on the causation issue *in every case* in which the defendant failed to adopt increased security measures of some kind. *Nola M.* [*v. University of Southern California* (1993) 16 Cal.App.4th 421, 429 [20 Cal.Rptr.2d 97]] observes that 'it would be grossly unfair to permit a lay jury, after the fact, to determine in any case that security measures were "inadequate," particularly in light of the fact that the decision would always be rendered in a case where the security had, in fact, proved inadequate . . . .' [Citation.] Similarly, in *Sharon P.* [*v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1194 [91 Cal.Rptr.2d 35, 989 P.2d 121]],[8] we quoted with approval a legal commentator's observation that if we simply relied on hindsight, the mere fact that a crime has occurred could always support the conclusion that the premises were inherently dangerous." (*Ibid.*)

---

[8] Overruled on other grounds in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527, footnote 5 [113 Cal.Rptr.3d 327, 235 P.3d 988], and in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, footnote 19 [107 Cal.Rptr.2d 841, 24 P.3d 493].

Common sense could not establish causation because "plaintiff must show some substantial link or nexus between omission and injury. Under the Court of Appeal's 'common sense' rule, the defendants' omission itself would constitute the missing link." (*Ibid.*)

Plaintiffs were required to establish a substantial link, or nexus, between the failure to warn and their injuries. Instead of introducing evidence to establish a link between the two, plaintiffs relied on common sense and common experience to convince the jury that if a warning had been issued, the accident would have been avoided. In doing so, the trial court allowed the jury to use hindsight to conclude that plaintiffs would have acted differently if they had *known* of odor fade. As explained above, mere knowledge is not enough to establish causation because it ignores the lack of evidence that any warning issued would have reached plaintiffs. In other words, this approach permitted the jury to ignore an element of plaintiffs' cause of action.

Here, plaintiffs' experts testified that information about odor fade was readily available had one sought it out. Indeed, one of their experts published an article about odor fade in a periodical directed to the plumbing industry. This is not a case where only the Gas Company's employees knew of odor fade. Plaintiffs could have learned of odor fade from any number of sources. They conclusively established (through their ignorance and the ignorance of their experts) that other sources of information about odor fade were ineffective to bring the issue to the plumbing industry. It is pure speculation to assert that a warning issued by the Gas Company would have succeeded where numerous cases and other sources failed.

In *Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234 [7 Cal.Rptr.2d 101] (*Osborn*), the plaintiffs' child contracted AIDS after receiving a blood transfusion provided by the defendant. Prior to the surgery, the plaintiffs had contacted the defendant and asked if they and their friends and relatives could donate the blood the child would need for the surgery. The defendant's receptionist informed the plaintiffs that directed donations were not permitted. The defendant's written policy, however, discouraged such donations but did not prohibit them.

The plaintiffs sued the defendant, alleging the refusal to allow directed donations was a negligent misrepresentation and, as a result, their child contracted AIDS from the tainted blood supply. The trial court excluded evidence offered by the defendant that the child had an extremely rare blood type and none of the individuals willing to donate blood on the child's behalf would have been able to do so. The appellate court held the evidence was erroneously excluded. "Evidence associated with [the child's] rare blood type was relevant to proximate cause. . . . [A]n additional problem presented by

the rare blood type was the extent to which any of the directed donations that would have been obtained could have been used. Ordinarily, of course, 'the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.' [Citation.] If directed donations for [the child] would not have been feasible, a misrepresentation precluding those donations did not affect the outcome of his case." (*Osborn, supra*, 5 Cal.App.4th at p. 254.)

Similarly, if the Gas Company here was negligent or strictly liable in failing to issue a warning about odor fade, its conduct was not a substantial factor in bringing about plaintiffs' harm, unless plaintiffs would have learned of the warning and altered their conduct because of the warning. It was incumbent upon plaintiffs to present evidence on this issue. Their failure to present such evidence precludes recovery in this case.

Plaintiffs have cited several cases from other jurisdictions that they claim establish causation. In *Tune v. Synergy Gas Corp.* (Mo. 1994) 883 S.W.2d 10 (*Tune*), the plaintiff was injured when propane leaked from an overfilled portable tank. The plaintiff, who was working 20 feet from the tank, did not smell the leaking propane. An explosion occurred, causing the plaintiff to sustain serious injuries. The plaintiff argued the defendant was liable for his injuries because it did not warn him that the odorant in propane, the same odorant as in natural gas, might not be noticeable in all conditions. The defendant argued there was no evidence that if a warning had been given, the plaintiff would have acted differently. The Missouri Supreme Court relied on a presumption that had a warning been given, it would have been heeded by the plaintiff, to conclude there was sufficient evidence to uphold the jury's verdict. (*Id.* at p. 14.)

This case does not aid plaintiffs for two reasons. First, it does not address the issue in this case—the ability of the Gas Company to issue a warning that would have reached plaintiffs. Second, the presumption relied on by the Missouri Supreme Court is not recognized in California.[9] Indeed, the Missouri Supreme Court dismissed the defendant's argument with little analysis, relying exclusively on the presumption.

Plaintiffs place particular reliance on *Donahue v. Phillips Petroleum Co.* (8th Cir. 1989) 866 F.2d 1008 (*Donahue*). In this case the plaintiffs were attempting to light a propane water heater when an explosion occurred. The

---

[9] We are aware of the comment included in the Restatement Second of Torts, cited by plaintiffs, that a sufficient warning permits the seller to assume the warning will be read and followed. (*Johnson, supra*, 43 Cal.4th at p. 65.) Even if this comment creates a presumption, an issue we need not decide, the presumption would be in favor of the seller, not the consumer, and certainly would not comport with the Missouri Supreme Court's analysis.

defendant supplied the odorant that was added to the propane. The plaintiffs obtained a verdict in their favor based on the allegation that the defendant was strictly liable because it failed to warn them that the odorant could diminish under various conditions. On appeal, the defendant argued it should be relieved of liability because it was impractical to give warnings. The appellate court, applying Missouri law, rejected the argument. "The fact that it might logistically be difficult to disseminate a warning does not undercut the strict liability analysis, which focuses on the condition of the product rather than the conduct of the defendant. [¶] Moreover, it is not, as [the defendant] suggests, impossible to warn as to the possibility of odor fade. Indeed, [the defendant's] assertion is belied by its own brochure explaining the danger, which was prepared after the accident involved here and was introduced into evidence on this issue. . . . [The defendant] made no effort to discharge its obligation by contracting with its purchaser to ensure that adequate warnings ultimately reach the consumer." (*Donahue*, at p. 1011.)

■ This analysis is less than compelling as it completely ignores the issue of whether any warning issued by the defendant would have reached the plaintiffs. To be liable in California, even under a strict liability theory, the plaintiff must prove that the defendant's failure to warn was a substantial factor in causing his or her injury. (CACI No. 1205.) The natural corollary to this requirement is that a defendant is not liable to a plaintiff if the injury would have occurred even if the defendant had issued adequate warnings. (*Osborn, supra,* 5 Cal.App.4th at p. 254.) We are unsure if Missouri law differs from the law of this state, or if the defendant failed to make an appropriate argument or if the appellate court simply overlooked the causation requirement. In any event, we are not persuaded by *Donahue*.

Nor are we persuaded by the other cases cited by plaintiffs, which address unrelated issues. (*Menschik v. Mid-America Pipeline Co.* (1991) 812 S.W.2d 861, 864–865 [rejected propane supplier's reliance on the bulk supplier and learned intermediary defenses]; *Heifner v. Synergy Gas Corp.* (Mo.Ct.App. 1994) 883 S.W.2d 29 [same accident as *Tune*—court of appeal adopts *Tune* analysis]; *Freeman v. United Cities Propane Gas, Inc.* (M.D.Ga. 1992) 807 F.Supp. 1533, 1538–1539 [finding triable issue of fact precluding summary judgment on learned intermediary defense under Ga. law]; *Stuckey v. Northern Propane Gas Co.* (11th Cir. 1989) 874 F.2d 1563, 1567–1569 [finding triable issue of fact on learned intermediary defense].)

## CONCLUSION

Odor fade is a potentially dangerous phenomenon that apparently is not well known in the new construction industry. Efforts should be made to inform appropriate individuals about the phenomenon, and we encourage the

Gas Company, as well as others in the industry, to undertake efforts to educate those working in new construction. Plaintiffs' failure to establish that a timely warning issued by the Gas Company would have prevented this accident, however, precludes recovery.[10]

## DISPOSITION

The judgment is reversed and the trial court is directed to enter judgment in favor of the Gas Company. The Gas Company is awarded its costs on appeal.

Wiseman, Acting P. J., and Hill, J., concurred.

A petition for a rehearing was denied October 29, 2010, and respondents' petition for review by the Supreme Court was denied January 19, 2011, S188177.

---

[10] The parties have submitted three requests that we take judicial notice of various items (the Gas Company's request for judicial notice was filed on Sept. 11, 2009; plaintiffs filed two requests for judicial notice, one on Jan. 29, 2010, and the other on July 27, 2010). Only one request was opposed—the July 27, 2010, request.

We deny the Gas Company's request. Each item was either contained in the record or need not be noticed judicially to be considered by this court. Moreover, our resolution of this case renders most of the documents irrelevant.

We deny plaintiffs' January 29, 2010, request for judicial notice. This request was for information apparently included on the Gas Company's Web site. This information was not introduced at trial and is not relevant. Moreover, the failure to introduce evidence that plaintiffs reviewed the Gas Company's Web site before the accident also makes the information irrelevant.

Finally, we deny plaintiffs' July 27, 2010, request for judicial notice. This request was directed to information contained on various Web sites. It relates to attempts by natural gas suppliers, in various forms, to educate the public about odor fade. None of the information was introduced at trial, and all of the information appears to have been generated after the date of the accident. It is not relevant and not a proper matter for judicial notice. Simply because information is on the Internet does not mean that it is not reasonably subject to dispute. (Evid. Code, § 452, subds. (g), (h).)