Filed 2/14/14  Corbo v. Taylor-Dunn Mfg. Co. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CHRISTOPHER CORBO et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>TAYLOR-DUNN MANUFACTURING COMPANY,<br><br>    Defendant and Respondent. | A135393<br><br>(Alameda County<br>Super. Ct. No. HG09477272) |

## I.  INTRODUCTION

Christopher Corbo was injured when his foot was crushed by an electric flatbed truck manufactured by Taylor-Dunn Manufacturing Company.  A jury found that Taylor-Dunn was liable for damages incurred by Corbo and his wife Lydia (appellants) on a theory of strict liability failure to warn.  The trial court, however, granted Taylor-Dunn's motion for judgment notwithstanding the verdict on the ground that there was insufficient evidence to support the jury's finding that failure to warn was a substantial factor in causing appellants' harm.

Appellants contend the judgment must be reversed because substantial evidence and reasonable inferences from that evidence support the jury's finding that the absence of a warning caused Corbo's injuries.  We reject this contention and affirm the judgment.

1

## II. STATEMENT OF FACTS

**A.** *The Accident*

**1.** *Background*

On October 3, 2007, Corbo's foot was seriously injured during an accident that occurred at the New United Motor Manufacturing Plant (the NUMMI plant) in Fremont, Alameda County. At the time, Corbo was employed by CTS Advantage Logistics (CTS), which provided shipping, moving and management services at the NUMMI plant. Corbo's direct supervisor was Sergio Fernandez who was employed by Vascor, Ltd., the contractor responsible for coordinating all logistical services at the NUMMI plant.

Corbo's foot was crushed when it was pinned between a metal stairwell outside a truck dock and the front end of an electric vehicle manufactured by Taylor-Dunn. The vehicle, described by trial witnesses as both a truck and a cart, was an open top vehicle with a 76-inch long flatbed separated from the passenger area by a 24-inch high metal partition. The front passenger area contained two seat cushions separated by a parking brake. The truck was operated by a toggle switch with three positions (Forward, Neutral, Reverse) and a floor brake pedal and accelerator pedal.

The front passenger area of the truck contained two posted warnings: (1) a "Safety Warning" consisting of a list of admonitions about what to do "Before Operating The Vehicle," "While Operating The Vehicle," and "Before Leaving or Servicing The Vehicle"; and (2) a decal warning showing the driver and passenger to keep extremities inside the vehicle. The list of admonitions on the Safety Warning label included instructions that "All occupants must be seated in manufacturer's approved seats"; not to engage in "horseplay"; and to "Apply Parking Brake."[1]

When the accident occurred, three men who worked at the NUMMI plant were in the front passenger area of the Taylor-Dunn truck. Tai Lam was in the driver's seat,

---

[1] The factual summary in the appellants' opening brief does not include any discussion of the safety warnings that were affixed to the truck. Because this is not the only relevant evidence appellants fail to mention, we encourage them to review the pertinent rules of court governing appellate briefs that are filed in this court.

2

Davin Castro was in the passenger seat, and Sergio Fernandez was sitting or standing in between them. At trial, the jury heard different versions of the accident from the four individuals who were involved.

### 2. *Christopher Corbo*

Corbo testified that, near the end of his work day, he and Fernandez drove to the truck dock to generate some paperwork for a truck that was going to be driven off the plant that day. Fernandez was already inside the building and Corbo was about to go inside when he heard someone yell his name. Corbo turned and saw the Taylor-Dunn truck approaching the dock. Corbo knew Lam, the driver, and his passenger, Castro, both of whom worked for a different company that provided services at the NUMMI plant. Lam pulled up and stopped the truck about three or four feet back from the stairwell leading up to the office.

Corbo assumed the men had a work-related question and went down the stairs to see what they needed, stopping directly in front of the Taylor-Dunn truck. Corbo could not hear the motor running, and did not see any lights on or any other indication that the truck was still in operation or "potentially capable of movement." Corbo stood approximately six inches from the front of the truck with his hands resting on the top rail and talked with Lam about a part that Lam needed and possibly some other work-related matters. A few minutes later, Corbo heard Fernandez come out of the office and down the stairs.

Corbo saw Fernandez walk over to the pickup truck they had been using and then to the back of the flatbed truck that Lam was driving. Fernandez climbed onto the back of the Taylor-Dunn flatbed and then over the partition and sat down in between Lam and Castro. At that point, Corbo had already taken his hands off the truck bar but he was still standing only six inches from the front of the truck and he continued to converse with the others for at least a few minutes. Then, the truck "lunged" forward, and Corbo took a few steps back before realizing he could not go any farther because the stairwell was behind him. Corbo felt the stairwell hit the middle of his back and the bottom of the

3

truck hit and "cut through" his left foot, and then come to a stop when it hit the stair behind his leg.

### 3. *Sergio Fernandez*

Fernandez testified that the accident occurred after he and Corbo had finished their work in the office at the truck dock. According to Fernandez, when he and Corbo came out of the office together, the Taylor-Dunn truck was already there, stopped several feet in front of the stairwell, and Lam and Castro were sitting in the truck, each with one leg over the side resting on the ground, taking a cigarette break.

Fernandez testified that Corbo stopped to talk while he went over to the pickup they had been driving and put his clipboard inside. Fernandez could not recall anything about the conversation other than that the three men laughed and it appeared they would talk for a while. So Fernandez went around to the back of the flatbed and climbed in. When he reached the front of the truck, he placed one hand on Lam's shoulder and the other on Castro's shoulder, climbed over the partition, and then sat down. There was plenty of room for him and he sat comfortably, partially on the driver's cushion and partially on the passenger's cushion, with his hands in his lap. Approximately 45 seconds later, the flatbed began to move. Then, Fernandez felt a "jerk" motion, the truck seemed to pick up speed, and it did not come to a stop until it made contact with the metal stairwell behind Corbo.

### 4. *Tai Lam*

Lam testified that he and Castro were using the Taylor-Dunn truck to locate a pallet of parts at one of the docks when they saw Corbo standing on the exterior stairwell at the truck dock. Lam called out to Corbo and then stopped the truck about four feet from the staircase, moved the "toggle switch" on the truck from Forward to Neutral, and placed his right foot on the floor of the truck under the brake pedal. He did not turn off the ignition or engage the parking brake.

Corbo came down the stairs and stood in front of the truck. Less than a minute later, Fernandez came out of the office and Corbo called him over, suggesting that they "do a threesome in the cart." Fernandez, who was holding a clipboard, walked past the

4

side of the truck while Corbo put his hands on the top bar and began pushing down on it. Then Fernandez climbed onto the back of the flatbed and proceeded to climb over the barrier into the passenger area of the truck. He put his left hand on Lam's shoulder while he held the clipboard in his right. As Fernandez brought his left leg over the barrier, he kicked Lam in the thigh, and the clipboard hit the toggle switch, pushing it into Forward. Then Fernandez dropped his left foot directly onto the accelerator pedal. Almost immediately, the truck began to move forward. Lam acknowledged that he did not take any action to stop the truck until after it made contact with the stairwell, at which point he moved the toggle switch from Forward to Reverse and backed it away from Corbo.

### 5. *Davin Castro*[2]

Castro testified that Lam was giving him a ride in the Taylor-Dunn truck when Corbo, who was sitting on the stairwell in front of the truck dock, called out to them. As Lam headed toward him, Corbo stood, walked forward a few feet and stopped. Lam stopped the flatbed a few feet in front of him. Castro was not paying attention to how Lam was driving, but he did recall that Lam moved the toggle switch to Neutral immediately after he stopped the truck. The three men exchanged greetings and then Corbo and Lam began to discuss a shipment of parts that was being delivered.

Very quickly thereafter, Fernandez came out of the office carrying a clipboard, said hello and then walked toward the pickup saying he would be right back. While Corbo and Lam continued their conversation, Corbo had his hands on a bar running across the front of the flatbed and was shaking the truck by pushing his weight down and up. The next thing Castro knew, Fernandez jumped into the cart, came up behind them and hopped in between Castro and Lam. Fernandez had not said anything before he did this and Castro was very surprised by the sudden movement.

Castro testified that when Fernandez jumped into the passenger area of the cart, both Castro and Lam had their legs inside the truck. There was no room between them

---

[2] Pursuant to a stipulation between the parties, excerpts from Castro's deposition were read to the jury at trial.

for Fernandez, who still had his clipboard in his hand, and that is when the accident occurred. Castro could not recall if Fernandez landed squarely on the floor with both feet but testified that he landed on some area near the floor and that "the forward momentum of him jumping forward pushed him into the dashboard of the cart," and the truck began to move forward "[a]lmost immediately." Castro admitted that he did not see any part of Fernandez's body hit the toggle switch, but testified that the clipboard that Fernandez was holding was directly over that switch just before the truck started to move.

## B.    *The Accident Investigation*

An investigation of Corbo's accident was conducted by Azadeh Morrison, NUMMI's Health and Safety Specialist. Morrison arrived at the truck dock while Corbo was receiving medical treatment, but waited until he was taken to the hospital to interview Lam, Castro and Fernandez. The group gave a very general account of the accident: Lam and Castro were in the stopped truck talking with Corbo; Fernandez climbed into the truck from the back; the truck moved forward; and Corbo was pinned between the truck and the stairwell. Although the report was short on details, Fernandez did deny that his foot hit the accelerator.

After Morrison returned to her office at the plant, she received a message that Lam and Castro wanted to talk with her. During the meeting that followed, the two men reported they had not been comfortable talking about the accident in front of Fernandez and that they wanted to clarify what happened. They told Morrison that they had been talking to Corbo when Fernandez arrived, that Corbo suggested that Fernandez climb in the flatbed so they could have a "threesome," that Lam had put the truck in the Neutral position but a clipboard Fernandez was holding hit the switch and flipped it to the Forward position; and that when Fernandez climbed in between them, his foot hit the accelerator pedal.

During her investigation, Morrison determined that the individuals involved in the Corbo accident had not received special training regarding the use of flatbed trucks but that Lam, Fernandez and Corbo had all received training to operate a forklift. As part of that training, they were advised regarding NUMMI's "[g]eneral driving rules" for

6

operating mobile equipment at the plant. Those rules prohibited, among other things, smoking in vehicles, horseplay and stunt driving. In addition, only one person was to occupy a seat in a vehicle at any time, and drivers were instructed not to stop the vehicle in front of a person standing in front of a fixed object.

Morrison arranged for an inspection of the Taylor-Dunn truck by the NUMMI maintenance department. She had conducted a preliminary test at the accident scene, driving it backward, forward and engaging the brake, and found no indication that the vehicle could have moved from a stopped position without somebody depressing the accelerator. The inspection performed at the plant's maintenance department confirmed that all of the systems on the flatbed truck were in proper working order.

At the instruction of NUMMI attorneys, Morrison did not complete her investigation of the accident. However, based on the information she gathered and her own experience driving flatbed trucks, Morrison concluded that the Taylor-Dunn truck involved in this accident could not have moved forward unless someone stepped on the accelerator pedal. At trial, appellants' expert engineer, John Manning, acknowledged finding no indication that the flatbed was capable of "spontaneous movement."

C.    *The Present Action*

Appellants' October 2009 complaint alleged causes of action against Lam, Fernandez, Taylor-Dunn and several other defendants. However, Taylor-Dunn was the only remaining defendant in the case when a jury trial commenced in August 2011, before the Honorable Ronni B. MacLaren.

Appellants' claim at trial was that Taylor-Dunn was strictly liable for their damages because the design of the flatbed truck caused Corbo's injuries. They attempted to show that the truck design was defective under three distinct theories: (1) a consumer expectation theory, that the truck did not perform as safely as an ordinary consumer would have expected it to perform; (2) a risk/benefit theory, that the truck design was a cause of Corbo's injuries and that the risks of the design were not outweighed by its benefits; and (3) a failure to warn theory, that the truck lacked sufficient instructions or warnings about the risks of harm.

7

Appellants' primary factual theory at trial was that the collision happened "because of the accidental movement of the toggle into drive, coupled with acceleration." Under this theory, the alleged defect in the Taylor-Dunn truck was that it "had a defective drive toggle, switch mechanism, that could accidentally be engaged." And the risk of harm which allegedly gave rise to a duty warn was the risk that human operators make mistakes and people accidentally bump into things. Taylor-Dunn's trial theory was that Lam never actually put the toggle switch in the Neutral position but simply left it in the Forward position when he stopped to talk to Corbo, and then, when Fernandez jumped in, somebody's foot hit the accelerator. Under this theory, Taylor-Dunn was not strictly liable for Corbo's injuries because the cause of the accident was horseplay, a misuse of the vehicle, and not the design of the flatbed truck.

At the conclusion of the trial, the jury rejected appellants' consumer expectation theory and risk/benefit theory, but found that Taylor-Dunn was strictly liable for appellants' damages because it failed to warn about the risk associated with the flatbed truck. Pursuant to a special verdict form, the jury found that (1) the truck had a potential risk that was known or scientifically knowable at the time it was manufactured; (2) the potential risk presented a substantial danger to users of the truck; (3) an ordinary consumer would not have recognized the potential risk; (4) Taylor-Dunn failed to adequately warn or instruct about the risk; and (5) the lack of sufficient instructions or warnings was a substantial factor in causing the plaintiffs' harm.

The jury also found that the negligence of several other actors were substantial factors causing Corbo's harm, and it apportioned fault as follows: Lam – 35 percent; Fernandez – 30 percent; NUMMI – 20 percent; Taylor-Dunn – 9 percent; Vascor – 4 percent; Corbo – 2 percent.

On December 28, 2011, Taylor-Dunn filed a motion for partial judgment notwithstanding the verdict (JNOV) on the ground that there was insufficient evidence to support the jury's finding that failure to warn was a substantial factor causing Corbo's injuries.

8

On January 6, 2012, the court entered judgment holding that Taylor-Dunn was liable to appellants for damages in the total amount of $1,383,417.86, plus costs and interest.

On January 27, 2012, the trial court conducted a hearing on the motion for JNOV, at the conclusion of which it requested supplemental briefing. After a second hearing on March 9, the court took the matter under submission. On April 2, 2012, the court granted the motion for JNOV in a detailed order the conclusion of which was that "there was no evidence from which the jury could have reasonably concluded that it was more likely than not that the accident would not have occurred if one of the warnings proposed by Plaintiffs had been provided." Thus, the trial court vacated the judgment and entered a new judgment in favor of Taylor-Dunn.

## III.  DISCUSSION

Appellants contend that the trial court erred by granting the JNOV because the evidence supports the jury's finding that the absence of a warning caused Corbo's injuries. " ' " ' "A motion for [JNOV] may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." [Citation.]' " [Citation.]' [Citation.] In reviewing an order denying a JNOV, we draw all reasonable inferences in favor of the jury's verdict. [Citation.]" (*Cash v. Winn* (2012) 205 Cal.App.4th 1285, 1304.)

### A.  *Legal Principles*

In California, strict products liability law recognizes three types of product defects: (1) manufacturing defects, (2) design defects, and (3) warning defects. (*Anderson v. Owens-Corning Fiberglas Corp*. (1991) 53 Cal.3d 987, 995.) This appeal pertains to the third category, "which applies to 'products that are dangerous because they lack adequate warnings or instructions.' [Citation.]" (*Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, 577 (*Taylor*).)

9

"Our law recognizes that even ' "a product flawlessly designed and produced may nevertheless possess such risks to the user without a suitable warning that it becomes 'defective' simply by the absence of a warning." [Citation.]' [Citation.] Thus, manufacturers have a duty to warn consumers about the hazards inherent in their products. [Citation.] The purpose of requiring adequate warnings is to inform consumers about a product's hazards and faults of which they are unaware, so that the consumer may then either refrain from using the product altogether or avoid the danger by careful use. [Citations.] (*Taylor, supra,* 171 Cal.App.4th at p. 577.) Accordingly, California holds "manufacturers strictly liable for injuries caused by their failure to warn of dangers that were known to the scientific community at the time they manufactured and distributed their product. [Citations.]" (*Johnson v. American Standard, Inc*. (2008) 43 Cal.4th 56, 64-65.)

However, "[t]o be liable in California, even under a strict liability theory, the plaintiff must prove that the defendant's failure to warn was a substantial factor in causing his or her injury. [Citation.]" (*Huitt v. Southern California Gas Co*. (2010) 188 Cal.App.4th 1586, 1604 (*Huitt*); see also *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968 (*Rutherford*); *Conte v. Wyeth, Inc. (*2008) 168 Cal.App.4th 89, 112 (*Conte*); CACI No. 1205 [plaintiff has burden of proving that lack of sufficient warnings or instructions was a substantial factor in causing plaintiff's harm].) "The natural corollary to this requirement is that a defendant is not liable to a plaintiff if the injury would have occurred even if the defendant had issued adequate warnings. [Citation.]" (*Huitt, supra,* 188 Cal.App.4th at p. 1604.)

**B.** *Analysis*

As reflected in our factual summary, the jury found that Taylor-Dunn's failure to warn about a risk associated with the electric truck caused Corbo's injury. However, the jury did not identify what risk the truck presented or what warning would have made a difference.

Appellants maintain that the risk of harm that gave rise to a duty to warn was that the flatbed would "suddenly and silently lurch forward and pin [Corbo] against a

10

stairway, causing serious and permanent injuries." With a variety of embellishments, this notion runs throughout their arguments on appeal. However, the record does not support this characterization of the risk associated with the flatbed because the jury rejected appellants' two theories of strict liability for defects in a product design. Indeed, the special verdict form contains an express finding that the design of the Taylor-Dunn truck was not a substantial factor causing Corbo's injury. Thus, the jury necessarily rejected testimony by Fernandez and Corbo that the flatbed suddenly lurched forward for no reason even though nobody stepped on the accelerator.

As noted in our factual summary, during closing argument, appellants' trial counsel argued that the risk of harm was that human operators make mistakes and that people accidentally bump into things. In other words, the risk was that the shift mechanism and accelerator on the flatbed could be unintentionally engaged. For purposes of this appeal, we will assume that the jury accepted this characterization of the risk of harm, which is supported by the evidence.

As best we can determine, appellants never clearly articulated for the jury how a warning about this risk should have been communicated by Taylor-Dunn. In this court, appellants contend that the jury could have based its liability finding on the absence of any one of three warnings: (1) a sign, light or signal on the front exterior of the truck warning pedestrians not to stand in front of the truck; (2) a warning label affixed to the interior of the truck cautioning the driver not to park the truck and remain in the driver's seat without turning off the ignition and engaging the parking brake; and (3) an interior sticker warning passengers not to have three people in the front seat.

Preliminarily, we reject appellants' contention that the absence of an exterior warning light or audible signal caused Corbo's injury. As the trial court explained in its order granting the JNOV, the absence of some form of sound or light signal that the motor was running is an alleged design defect which cannot support a liability finding based on failure to warn under the circumstances of this case because the jury rejected appellants' design defect theories. Thus, in addressing appellants' arguments on appeal, we limit our analysis to hypothetical warning labels or stickers that could have been

11

affixed to the Taylor-Dunn electric vehicle on locations that would have been in the line of view of the individuals involved in Corbo's accident.

During the JNOV proceedings, appellants did not dispute that "there was no testimony at trial that any of the individuals involved in the injury-causing incident testified that he would have heeded a warning, if one had been provided." Indeed, Corbo did not testify that, if he had seen a warning label on the exterior of the Taylor-Dunn truck, he would have stopped to read it and then acted differently than he did when the accident occurred. Lam did not testify that he would have taken notice of or complied with any warning label about sitting in the driver's seat without turning off the ignition or engaging the parking brake. Nor did Fernandez or any other witness testify that he would have acted differently had he seen a warning label to not have three people in the front seat.

On appeal, appellants spend significant time arguing that direct evidence of causation is not required in a strict liability failure to warn case. They contend, among other things, that such self-serving testimony regarding a "[h]indsight [t]ruism" wastes times, lacks substantive weight, and will almost always elicit an objection from the defense. We are perplexed by these arguments.

Courts in this state have long recognized that proving causation in a defective products case can be difficult and, indeed, that direct evidence of causation may not exist. (*Dimond v. Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173, 183 (*Dimond*).) Thus, a plaintiff may carry his burden of proving causation by circumstantial evidence. (*Ibid*.) Furthermore, as best we can tell, there has never been any dispute in this case that the causation element of a failure to warn claim can be proven with circumstantial evidence. In fact, the jury was instructed pursuant to CACI No. 202, that "[s]ome evidence proves a fact directly," that "[s]ome evidence proves a fact indirectly," that indirect evidence is sometimes referred to as " 'circumstantial evidence,' " and that "As far as the law is concerned, it makes no difference whether evidence is direct or indirect."

Appellants strongly intimate that the trial court erroneously demanded direct evidence of causation. However, the order granting the JNOV contains an express

12

finding that "None of the testimony cited by Plaintiffs provides a basis from which it can be logically and reasonably inferred that any of the participants would have altered his conduct, in a way that would have prevented Plaintiff Corbo's injuries, if he had seen a warning." Thus, the court granted the JNOV because if did not find sufficient direct or circumstantial evidence to support the jury's causation finding.

Our review of the evidence leads us to the same conclusion the trial court reached. It remains undisputed that there is no direct evidence that the absence of these warnings caused this accident to happen. Nor do we find substantial circumstantial evidence of causation in the trial record. For example, there is no evidence suggesting any of the individuals involved in this accident are careful people, or that they looked for, were concerned by, or followed warnings regarding the performance of their job duties at the NUMMI plant. Nor were there any circumstances about this particular incident which suggest in any way that the people involved would have acted differently if one of appellants' hypothetical warnings had been affixed to the electric truck.

Appellants insist that this record supports an inference that the absence of an adequate warning caused this accident. They maintain that "the only reasonable—indeed, virtually inescapable—inference, which the jury was allowed to make and did in fact make, is that Corbo would have heeded a warning not to stand in front of Taylor-Dunn's truck if he had known that it would suddenly and silently lurch forward and pin him against a stairway, causing serious and permanent injuries." But the issue is not whether Corbo would have heeded a warning had *he known* that failure to do so would cause him injury. The pertinent question is whether, without the benefit of that hindsight knowledge, Corbo or one of the other three men would have altered their conduct in a way which would have avoided the accident if the truck had contained a specific warning about the danger of a negligent or accidental acceleration.

"An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b)) In other words, an inference must be drawn from the evidence. (*Collin v. American Empire Ins. Co*. (1994) 21 Cal.App.4th 787, 808 (*Collin*).)

13

Appellants do not identify any evidence to support an inference that the absence of a warning was a substantial factor causing this accident. *Dimond, supra,* 65 Cal.App.3d 173, a case upon which appellants' mistakenly rely, illustrates our point.

*Dimond* was a strict liability product defect case against the manufacturer of a forklift that plaintiff was using when he suffered serious personal injuries during a warehouse accident. The plaintiff alleged that the forklift was defective both in its design and because it was accompanied by a defective warning. (*Dimond, supra*, 65 Cal.App.3d at p. 176.) To prove these claims, the plaintiff produced evidence that he sustained his injuries while working alone in a warehouse, using the forklift to move and store packaged rolls of printing paper weighing approximately 550 pounds each. (*Id.* at p. 177.) Co-workers found the plaintiff after they heard a "loud boom" in the warehouse. He was face-down on the ground behind the forklift, with his feet closest to it. Two of the 550 pound rolls were on top of the plaintiff and a third roll was on the other side of the forklift. There was a dent in the overhead protective cage of the forklift which had not been there when the plaintiff started his shift; the "clamp" component of the forklift was secured around a stack of papers; and the gear shift was in the neutral position, although the motor was still running. (*Id.* at p. 178.)

At trial, the *Dimond* plaintiff was unable to recount the circumstances of the accident itself because his injuries caused retrograde amnesia. (*Dimond, supra,* 65 Cal.App.3d at p. 178.) Nevertheless, he testified that he had seen warnings in the operator's manual and on the forklift itself which advised that the overhead cage would not afford protection against " 'heavy or capacity loads.' " (*Ibid*.) Plaintiff also testified that he had feared that something might hit the exposed propane tank on the forklift and cause an explosion to occur. Finally, plaintiff testified that he always placed the forklift gear in neutral and turned off the motor before he dismounted the vehicle. (*Ibid*.) At trial, the plaintiff also presented expert testimony that the position of the propane tank rendered the forklift defective and that the posted warning regarding the strength of the overhead cage was inadequate and defective because it was ambiguous and dangerously misleading. (*Id.* at p. 179.)

After the *Dimond* plaintiff presented his case at trial, the court granted a nonsuit to the defendant on the ground there was insufficient evidence to establish causation. (*Dimond, supra*, 65 Cal.App.3d at p. 180.) The *Dimond* court reversed. The court reasoned that, in order to accept the plaintiff's theory of liability, the factfinder would have to draw two inferences: (1) that the plaintiff was on the forklift when the paper rolls began to fall; and (2) that the plaintiff left the "safe enclosure of the overhead guard" either because of the misleading warning or because of the positioning of the exposed propane tank. Finding that substantial circumstantial evidence supported these inferences, the court concluded that the nonsuit should not have been granted. (*Id*. at pp. 180-183.)

Regarding the element of causation, the *Dimond* court acknowledged plaintiff's amnesia precluded his direct testimony on this issue. (*Dimond, supra*, 65 Cal.App.3d at p. 182.) Nevertheless, causation was established by evidence that the plaintiff had read the misleading warnings that the overhead cage would not protect him from a heavy or capacity load and that plaintiff feared a possible explosion from a falling object striking the propane tank. In light of this evidence, the court found, "[i]t is a perfectly logical and reasonable deduction that when confronted with a falling object of substantial weight, plaintiff acted in conformity with his expressed concerns." (*Id*. at p. 185.)

*Dimond* illustrates that direct evidence of causation is neither required nor necessary to establish the causation element of a strict product liability failure to warn claim. But, as the *Dimond* court underscored, that does not mean that the burden of proof shifts to the defendant; causation can be inferred, but only when there is sufficient circumstantial evidence to support that inference. (*Dimond, supra,* 65 Cal.App.3d at p. 184.) In the present case, appellants have not identified any direct or circumstantial evidence in this record which substantially supports the jury's finding that the absence of a warning about the risk of using the Taylor-Dunn flatbed truck was a substantial factor causing this accident.

In fact, many circumstances established or supported by the trial evidence are inconsistent with the inference that the warning labels appellants propose would not have

prevented this accident. First, as reflected in our factual summary, the Taylor-Dunn truck did have a Safety Warning label. Yet the circumstances show that Lam, Castro and Fernandez ignored several of the admonitions listed on that warning. Furthermore, to the extent the jury credited Fernandez's version of the accident, Lam and Castro also ignored the decal advisement to keep their legs inside the vehicle.

Second, as we also note above, Corbo, Fernandez and Lam received training regarding operating a forklift, which included advisement regarding the "[g]eneral driving rules" at the NUMMI plant. In addition, Gary Durham, who was Fernandez's direct supervisor at the time of the accident, testified that he discussed several of these rules with Fernandez and Corbo.[3] Although there was conflicting evidence regarding compliance with some of these safety rules (e.g., smoking in the vehicle, horseplay), undisputed evidence shows that these men did not follow the general rules that only one person was to occupy a seat in a vehicle at any time and that a driver was not to stop a vehicle in front of a person standing in front of a fixed object.

Third, evidence presented at trial showed that Lam and Castro were not only aware of the rule against having three people in a vehicle seat that was designed for two people, they had been disciplined for violating that rule in the past. At trial, Lam admitted that, on an occasion before Corbo's accident, he and Castro were "busted" by a supervisor for having three people in the front seat of a golf cart.

In their reply brief, appellants contend these circumstances are not dispositive because the jury was not required to draw the inference Taylor-Dunn wanted, i.e., that the individuals involved in this accident would not have heeded a warning. This argument misperceives the burden of proving causation. Appellants had that burden and they did not produce sufficient circumstantial evidence to support an inference of causation. Taylor-Dunn did not have the burden of rebutting an inference that was never established.

---

[3] Durham also testified that Fernandez had a reputation among his co-workers as someone who goofed around.

Finally, appellants argue that, to the extent the resolution of this issue depends on an inference, the "telling fact is that Corbo was crushed because he was standing in front of the truck when it lurched forward. That fact supports an inference he would not have stood in front of the truck had he been warned of the danger. There was no evidence, for example, that Corbo did not care whether he was crushed against a stairwell."

This final argument highlights a flaw that runs throughout appellants' arguments on appeal. If the fact of injury itself was sufficient to support an inference of causation, then causation would never be an issue in a failure to warn strict products liability case. That simply is not the law; the plaintiff has the burden of proving causation and he cannot sustain that burden if there is no evidence that a warning would have made any difference. In other words, the question is not what Corbo would have done had he known his foot would be pinned between the truck and metal stairs but, rather, whether he would have heeded a warning not to stand in front of the truck even though he did not know that the accident was about to happen.

## C.   *Appellants' Alternative Theories for Proving Causation*

Although appellants fail to squarely acknowledge the evidentiary void in this case, they propose two alternative grounds upon which to affirm the jury's causation finding: (1) that causation in this context is a question of common sense which can be established by asking what a reasonable person in Corbo's position would have done had a warning been provided; and (2) that this court should recognize a "presumption" that Corbo would have heeded a warning if one had been provided.

### 1.   *The Reasonable Person Test*

Claiming to raise a question of first impression under California products-liability law, appellants ask this court to find that an "objective reasonable-person test" substantially supports the jury's causation finding in this case. Appellants contend that the causation element of a failure to warn claim is different than causation in other types of product liability cases because an inquiry about what an actor would have done if a warning had been given is inherently speculative. Therefore, appellants posit that

17

employing an objective reasonable person analysis to determine whether the absence of a warning caused a plaintiff's harm would be the most equitable way to resolve this issue.

The first problem with this theory is that it is not the theory upon which this case was tried and this jury was instructed. The trial court used a version of CACI No. 1205 to instruct the jury regarding the essential factual elements of appellants' strict liability failure to warn claim. That instruction stated that plaintiffs were required to prove seven elements, the last of which was "That the lack of sufficient instructions or warnings was a substantial factor in causing Christopher Corbo's harm." We find no indication in the record that appellants objected to this instruction or requested any special instruction regarding the causation element of its failure to warn claim.

Another problem with appellants' reasonable person test for proving causation is that it does not raise a "question of first impression" as appellants contend. (See *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763 (*Saelzler*); *Huitt, supra*, 188 Cal.App.4th 1586.)

In *Saelzler, supra,* 25 Cal.4th 763, plaintiff sued a business owner for injuries she sustained during a criminal assault that occurred on the defendant's premises. In affirming a plaintiff's verdict, the Court of Appeal adopted a "practical approach to the causation issue" by relying on "common sense and common experience" to conclude that the absence of required security measures at the defendant's premises was a contributing cause of the crime. (*Id*. at p. 778.) However, the Supreme Court reversed the judgment on the ground there was insufficient evidence of causation. The court reasoned that the Court of Appeal's common sense approach was not based in the evidence, and was fundamentally unfair to the defendant because it permitted a lay jury to make an after the fact determination of causation. As the court explained, "if we simply relied on hindsight, the mere fact that a crime has occurred could always support the conclusion that the premises were inherently dangerous." (*Ibid*.)

Thus, the *Saelzler* court held that "to demonstrate actual or legal causation, the plaintiff must show that the defendant's act or omission was a 'substantial factor' in bringing about the injury. [Citations.] In other words, plaintiff must show some

substantial link or nexus between omission and injury." (*Saelzler, supra,* 25 Cal.4th at p. 778.) The Court of Appeal's " 'common sense' " rule, was inconsistent with this test because under that faulty approach "the defendants' omission itself would constitute the missing link." (*Ibid.*) The *Saelzler* court also rejected the appellant's contention that the substantial factor test for proving causation would make it "virtually impossible" to prove a negligence claim against a landlord or property owner for failure to take reasonable protective measures to safeguard others from a third party criminal assault. (*Id.* at p. 779.) The court reasoned that it could readily imagine a case in which "direct or circumstantial evidence" would establish the requisite substantial causal link between the third party assault and the defendant's negligence, although no such evidence was produced by the appellant. (*Ibid.*)

Finally, the *Saelzler* court rejected appellant's contention that the circumstances justified shifting the burden of proving causation to the defendant. (*Saelzler, supra*, 25 Cal.4th at p. 779.) The Court of Appeal had accepted that notion, finding that the defendant's "flagrant failure to provide daytime security justified shifting the burden of proof to defendants to conclusively establish the absence of a causal relation between its breach of duty and the assault on plaintiff . . . ." (*Id.* at pp. 779-780.) However, the *Saelzler* court strongly disagreed, holding that "[n]o matter how inexcusable a defendant's act or omission might appear, the plaintiff must nonetheless show the act or omission caused, or substantially contributed to, her injury. Otherwise, defendants might be held liable for conduct which actually caused no harm, contrary to the recognized policy against making landowners the *insurer* of the absolute safety of anyone entering their premises. [Citations.]" (*Id.* at p. 780.)

The *Saelzler* holdings were applied in a strict liability failure to warn case in *Huitt, supra*, 188 Cal.App.4th 1586. The *Huitt* plaintiffs were injured while attempting to light a water heater at a construction site. When the heater would not light, they decided to bleed any accumulated air in the natural gas pipe. However, when they made another attempt to light the pilot light, the gas that had been released into the water heater closet exploded and plaintiffs were seriously injured. (*Id.* at p. 1588.) In the strict liability

action that followed, plaintiffs alleged the defendant gas company had a duty to warn them that new steel gas pipes absorb an odorant which is added to natural gas so that its presence is detectable. Plaintiffs also alleged that the breach of that duty to warn caused their injuries because if plaintiffs had known about the odor fade they would not have bled the gas pipe into the water heater closet. The jury accepted this theory and awarded plaintiffs compensatory and punitive damages. (*Ibid*.)

The *Huitt* court reversed the judgment, finding insufficient evidence that the defendant's failure to issue a warning was a substantial factor causing the plaintiffs' harm. (*Huitt, supra,* 188 Cal.App.4th at pp. 1589, 1596-1600.) The court reasoned that the primary causation issue presented by the facts was whether there was any effective way that a warning issued by the gas company would have reached the plaintiffs. No evidence was produced to support an affirmative response to that question. Instead, the plaintiffs relied solely on "common sense and common experience to convince the jury that if a warning had been issued, the accident would have been avoided." (*Id*. at p. 1602.) Then the trial court permitted the jury to use "hindsight to conclude that plaintiffs would have acted differently if they had *known* of the odor fade." (*Ibid*.) The *Huitt* court found that this "approach" was error because it permitted the jury to ignore the causation element of the failure to warn claim. (*Ibid*.)

Appellants' reasonable person test for proving causation is just another label for the common sense approach disapproved in *Saelzler* and *Huitt*. Adopting such a test would relieve the plaintiff of his burden of proving the causation element of a failure to warn claim by authorizing the jury to speculate about what a hypothetical reasonable person would do rather than basing its causation determination on the evidence in the case. In their opening brief to this court, appellants ignore *Saelzler* and, in their reply brief, they take the position that *Saelzler* is inapposite because it was not a strict liability failure to warn case. However, the *Saelzler* court addressed the same substantial factor test that California uses to determine causation in a failure to warn case. Furthermore, *Huitt* applied the *Saelzler* holding to resolve the same issue raised by this appeal.

20

Contending that our Supreme Court has already tacitly approved a reasonable person test for proving causation, appellants direct our attention to *Cobbs v. Grant* (1972) 8 Cal.3d 229, 245 (*Cobbs*).) The *Cobbs* court addressed the elements of a medical malpractice case based on a theory that a doctor's failure to disclose the risks of surgery vitiated the plaintiff's consent to an operation. The court confirmed that informed consent cases require a causal relationship between the physician's failure to inform and the plaintiff's injury. (*Ibid*.) But the court also acknowledged problems inherent in a plaintiff's testimony on this subject since, at the time of trial, the uncommunicated hazard has already materialized. Thus, the court found that "an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils." (*Ibid*.) As appellants contend, this objective standard for proving causation is also embodied in standard jury instructions regarding informed-consent medical malpractices cases. CACI No. 533 states that, in order to establish causation, the plaintiff must show "[t]hat a reasonable person" in the plaintiff's position would not have agreed to the procedure if he had been fully warned of its risks.

However, appellants overlook the fact that this is not a medical malpractice case. They provide no reason or authority for their assumption that the policies underlying medical malpractice law should apply in this very different context. More to the point, because this is not a medical malpractice case, CACI No. 533 was not the causation instruction that was given to the jury in this case. Here, the jury was instructed—without objection—that the plaintiffs had the burden of proving that the alleged failure to warn about a risk of the flatbed truck was a substantial factor causing harm. That substantial factor test cannot be satisfied by resort to common sense or an objective reasonable person test. (*Saelzler, supra,* 25 Cal.4th 763; *Huitt, supra*, 188 Cal.App.4th 1586.)

## 2. *The Heeding Presumption*

Appellants' second argument is that the jury's verdict can be sustained by giving Corbo the benefit of a "heeding presumption" that he would have heeded a warning not to stand in front of the Taylor-Dunn flatbed if such a warning had been given.

21

Courts in some jurisdictions have applied a heeding presumption to the causation element of product-liability cases based on a failure to warn theory. (See *Coffman v. Keene Corp.* (1993) 133 N.J. 581, 600-603 (*Coffman*), and authority collected there.) In those jurisdictions, the plaintiff is "afforded the use of the presumption that he or she would have followed an adequate warning had one been provided, and . . . the defendant in order to rebut that presumption must produce evidence that such a warning would not have been heeded." (*Id*. at p. 603.) Thus, use of this rebuttable heeding presumption shifts the "plaintiff's burden of proof on the issue of causation as it relates to the absence of a warning." (*Ibid*.)

Appellants cannot rely on the heeding presumption to establish causation in this case for at least two reasons. First, as best we can determine, appellants never even mentioned this heeding presumption until after the trial was completed. Certainly, a jury instruction on the heeding presumption was neither given nor requested. Therefore, two principles bar appellants from raising this theory now: (1) a plaintiff cannot complain about the trial court's failure to give an instruction he never requested; and (2) issues not raised in the trial court cannot be raised for the first time on appeal. (*Willden v. Washington National Ins. Co.* (1976) 18 Cal.3d 631, 636; *Montez v. Ford Motor Co.* (1980) 101 Cal.App.3d 315, 320; *Jines v. Abarbanel* (1978) 77 Cal.App.3d 702, 712-713.)

Applying these principles to preclude appellants from raising this new theory is particularly appropriate in light of the fact that the heeding presumption shifts the burden of proof; since appellants did not invoke this presumption at trial, Taylor-Dunn had no notice of or opportunity to rebut it. Furthermore, as a matter of fact, this heeding presumption cannot be used to support a finding by a jury that was never even instructed about the presumption.

Second, as the trial court stated in its JNOV order, California does not recognize the heeding presumption. (*Huitt, supra*, 188 Cal.App.4th at p. 1603; see also *Dimond, supra*, 65 Cal.App.3d at p. 185 & fn. 8 [finding no California case applying presumption and expressly declining to rely on a presumption to establish causation]; *Motus v. Pfizer,*

*Inc.* (C.D. Cal. 2001) 196 F.Supp.2d 984, 992, fn. 5 ["the California Supreme Court has not applied and would not apply the presumption."].)

Appellants contend that a special jury instruction on the heeding presumption was not required because this "permissive presumption" is really nothing more than an inference that the jury was allowed to and allegedly did make. This "inference" was permissible, appellants contend, because it is implicitly recognized by California law. We will separately address the two flawed prongs of this erroneous argument.

First, the heeding presumption is not an inference. As explained earlier in our analysis, an inference is a deduction of fact that may logically and reasonably be drawn from evidence in the case. (Evid. Code, § 600; *Collin, supra,* 21 Cal.App.4th at p. 808.) Furthermore, an inference does not shift the burden of proof. (*Dimond, supra*, 65 Cal.App.3d at p. 184.) By contrast, the heeding presumption does shift that burden. (*Coffman, supra*, 133 N.J. at p. 603.)

Appellants maintain that there is no substantive distinction between a "permissive presumption" and an inference. (Citing *People v. McCall* (2004) 32 Cal.4th 175, 182.) This observation is beside the point because the heeding presumption is a mandatory presumption; it shifts the burden of proof. (*Coffman, supra*, 133 N.J. at pp. 600-603.) Furthermore, if the heeding presumption could somehow be re-packaged as an inference, then circumstantial evidence would be required to support it. As we have already explained above, the causation element of a failure to warn claim can be established inferentially with circumstantial evidence. (*Dimond, supra*, 65 Cal.App.3d 173.) Here, however, there is no circumstantial evidence in the trial record to support an inference of causation. Thus, what appellants ask now is to fill that evidentiary void by "recognizing" a presumption that would not only lessen their burden of proof but shift that burden to Taylor-Dunn.

The second prong of appellants' erroneous argument is that, although no California case has explicitly adopted the heeding presumption, this doctrine is "inherent in—indeed, is the premise of—California's reasonable person test." As we have already explained, appellants' reasonable person test is not the standard that California applies in

a strict product liability case. Under California law, the plaintiff alleging strict liability for a failure to warn must prove that the alleged failure to provide adequate warning was a substantial factor in bringing about the injury. (*Huitt, supra*, 188 Cal.App.4th at p. 1604; *Rutherford, supra,* 16 Cal.4th at p. 968; *Conte, supra,* 168 Cal.App.4th at p. 112; CACI No. 1205.)

Furthermore, the heeding presumption is not another label for a reasonable person test, as appellants contend; it is a doctrine which shifts the burden of proof regarding an essential element of a failure to warn claim. (*Coffman, supra*, 133 N.J. at pp. 600-603.) There may be sound policies for adopting that doctrine, but in view of the law discussed above, this appeal is not the proper process for seeking such a change.

### III. DISPOSITION

The judgment is affirmed.


_____
Haerle, J.


We concur:


_____
Kline, P.J.


_____
Brick, J.*


\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.